1
2
3              **UNITED STATES DISTRICT COURT**
4             **NORTHERN DISTRICT OF CALIFORNIA**
5                   **SAN JOSE DIVISION**
6

7    AMANDA SOMMERS, et al.,                 Case No.  17-cv-04469-BLF
8                    Plaintiffs,
                                             **ORDER GRANTING IN PART AND**
9          v.                                **DENYING IN PART MOTION FOR**
                                             **SUMMARY JUDGMENT**
10   CITY OF SANTA CLARA, et al.,
                                             [Re:  ECF 41]
11                   Defendants.
12

13          On March 9, 2017, 24-year-old Jesus Geney Montes, who was unarmed, was shot and

14   killed by Defendant police officer Colin Stewart. Out of this tragedy comes this litigation.

15   Plaintiffs Amanda Sommers and Richard Sommers, Mr. Geney Montes's mother and stepfather,

16   respectively, are suing Officer Stewart and the City of Santa Clara ("the City") for using excessive

17   and unreasonable force against their son, who was in the throes of a mental health breakdown, and

18   for acting with deliberate indifference to Mr. Geney Montes's constitutional rights. Mr. and Ms.

19   Sommers also bring claims under California state law and accuse Defendants of discriminating

20   against Mr. Geney Montes on the basis of a mental health disability.

21          Defendants have brought a summary judgment motion seeking the dismissal of all claims

22   and assert a defense of qualified immunity for Defendant Stewart on the excessive force claim. *See*

23   Mot., ECF 41. Mr. and Ms. Sommers oppose this motion. *See* Opp'n, ECF 51-1. After considering

24   the parties' briefing and oral arguments at the January 7, 2021 hearing, the Court GRANTS IN

25   PART and DENIES IN PART Defendants' motion for summary judgment.

26

27   **I.      BACKGROUND**

28          Mr. Geney Montes was born on July 20, 1992, in Colombia. Decl. of Amanda Sommers

*United States District Court*
*Northern District of California*

("Sommers Decl.") ¶ 1, ECF 44-1. He moved to Santa Clara with his mother in 2005. *Id.* After arriving in the United States, Ms. Sommers met and married her husband, Mr. Sommers. *Id.* ¶ 2. The three of them lived together in an apartment in the City. *Id.* Mr. Geney Montes had no contact with his biological father, so Mr. Sommers was the only farther he knew. *Id.*

Mr. Geney Montes initially transitioned well to the United States. Sommers Decl. ¶ 3. However, beginning in his late teens, his mother noticed a change in him. *Id.* ¶ 4. He was treated for anxiety when he was 21, but his condition did not approve. *Id.* Between 2016 and 2017, Mr. Geney Montes began suffering from paranoia, believing that third parties were actively trying to harm him. *Id.* At the end of his life, he would go days without sleeping. *Id.* Since Mr. Geney Montes was legally an adult, his mother could not get information about his condition from his doctors. *Id.*

In February 2017, Ms. Sommers planned to take her son to Colombia for mental health treatment. Sommers Decl. ¶ 5. They flew from California to Houston, but while in Houston waiting for their connecting flight, Mr. Geney Montes began to panic. *Id.* ¶ 6. Ms. Sommers and Mr. Geney Montes returned to California. *Id.* When they arrived in San Francisco, Mr. Geney Montes began to act erratically. *Id.* ¶ 6. Ms. Sommers and a friend drove Mr. Geney Montes to the Santa Clara Police Department, where officers determined Mr. Geney Montes was suffering from a mental breakdown. *Id.* The officers placed him on a 5150 hold and took Mr. Geney Montes to Santa Clara Valley Medical Center. *Id.* Mr. Geney Montes was involuntarily admitted for a psychiatric assessment but was released shortly thereafter. *Id.*

Leading up to Mr. Geney Montes's final day on March 9, 2017, he was not sleeping. Sommers Decl. ¶ 7. On the morning of March 9, Mr. Geney Montes refused to come out of his room to eat breakfast. *Id.* Ms. Sommers grew concerned called the Santa Clara police. *Id.*

### A.   First Call

Ms. Sommers called the Santa Clara police through 911 around approximately 8:05 a.m. Decl. of Jake Malae ("Malae Decl.") ¶ 3, ECF 41-4. She reported that her son had not slept in four days and needed to see a psychologist. *Id.* Officers went to the residence but did not see Mr. Geney Montes because he would not leave his bedroom. *Id.* The officers determined they did not

1  have cause to force entry and left shortly after their arrival. Malae Decl. ¶ 3; Sommers Dec. ¶ 10.

2  Ms. Sommers maintains that she had a document from Santa Clara Valley Medical Center stating

3  that Mr. Geney Montes suffered from a disorder. Sommers Dec. ¶ 9. According to her, she showed

4  this document to at least one of the officers that came to the house. *Id.*

### B.   Second Call

5

6  At approximately 9:28 a.m., Ms. Sommers called the Santa Clara police again. Malae Decl.

7  ¶ 4. She feared that Mr. Geney Montes was suicidal. Sommers Decl. ¶ 11. Mrs. Sommers told the

8  police that Mr. Geney Montes was threatening to choke himself with his hands. Sommers Decl. ¶

9  11; Malae Decl. ¶ 4. Ms. Sommers also reported that her son was calling her the devil. Sommers

10  Decl. ¶ 11; Malae Decl. ¶ 4. The police spoke to Mr. Geney Montes through his bedroom door, but

11  he yelled at them to not enter the room. Malae Decl. ¶ 5. The supervising officer on the scene

12  decided they would not be forcing entry into the room because he was not committing a crime. *Id.*

13  One crisis-intervention trained officer spoke with Mr. Geney Montes, and Mr. Geney Montes told

14  him that he did not want to hurt himself or anyone else and wanted to be left alone. Malae Decl. ¶

15  6. The officers left the residence again.

### C.   Third Call

16

17  At approximately 1:58 p.m., Ms. Sommers called the Santa Clara police for a third time.

18  Malae Decl. ¶ 7; Sommers Decl. ¶ 12. Ms. Sommers reported that Mr. Geney Montes had told her

19  that he had a knife and was going to kill himself. Sommers Decl. ¶ 12. None of the officers

20  entered the residence on this trip. Malae Decl. ¶ 7. The same crisis-intervention trained officer

21  spoke with Mr. Geney Montes via telephone. Malae Decl. ¶ 7. Mr. Geney Montes denied telling

22  his mother that he was going to kill himself, and he told the officer he did not presently feel that

23  way. Malae Decl. ¶ 7. Mr. Geney Montes also adamantly refused to come out of his room. *Id.* One

24  officer on the scene noted that Mr. Geney Montes was displaying symptoms of an individual

25  going through a mental health crisis. Dep. of Mark Shimada 76:21-23, ECF 45. The police left,

26  again. Malae Decl. ¶ 7.

### D.   Fourth Call

27

28  Ms. Sommers called the Santa Clara police for a fourth time that day. Sommers Decl. ¶ 13;

United States District Court
Northern District of California

1   Malae Decl. ¶ 8. The call was made at approximately 3:11 p.m. Malae Decl. ¶ 8. Ms. Sommers

2   told dispatch that Mr. Geney Montes said he had a gun. Sommers Decl. ¶ 13; Malae Decl. ¶ 8.

3   Approximately one hour earlier, Mr. Sommers had returned home and unsuccessfully attempted to

4   open and gain entrance to Mr. Geney Montes's room. Sommers Decl. ¶ 13; Malae Decl. ¶ 8. Mr.

5   Geney Montes had threatened Mr. Sommers with a knife, and Mr. Sommers had retreated without

6   being injured. Sommers Decl. ¶ 13; Malae Decl. ¶ 8. Many police officers responded this time,

7   and they closed the street and evacuated nearby apartments. Sommers Decl. ¶ 13; Malae Decl. ¶ 9.

8   Mr. Sommers told Officer Jake Malae that he did not want Mr. Geney Montes arrested for any

9   crime involving the knife or threatening him. Malae Decl. ¶ 8. According to Officer Malae, Mr.

10  Geney Montes yelled threats and said he had a gun and would shoot any police officer if they

11  made entry. *Id.*

12       The police spoke to Mr. Geney Montes for about an hour. Sommers Decl. ¶ 14; Malae

13  Decl. ¶ 12. The police officers made the decision not to force a confrontation with Mr. Geney

14  Montes and left the scene. Malae Decl. ¶ 12. As the officers were leaving, Mr. Geney Montes told

15  Ms. Sommers that he had stabbed himself, and she communicated this to Officer Chris Pilger, who

16  was still talking with Mr. Sommers outside the residence. Sommers Decl. ¶ 15; Dep. of Chris

17  Pilger ("Pilger Dep.") 71:4-9, ECF 45. Officer Pilger, though, was told by another officer that the

18  decision had been made to clear the call, so no officer went back inside to check on Mr. Geney

19  Montes. Sommers Decl. ¶ 15; Pilger Dep. 72:1-17. Officer Pilger's report from this call notes that

20  Mr. and Ms. Sommers "both know that Geney has mental health problems." Pilger Dep. 65:11-25.

21       **E.    Fifth Call**

22       Ms. Sommers called the Santa Clara police one last time. Sommers Decl. ¶ 13. The parties

23  agree that the call came shortly after the officers had left the scene—Ms. Sommers estimated she

24  called 5-10 minutes after the officers had left. Sommers Decl. ¶ 13; Decl. of Colin Stewart

25  ("Stewart Decl.") ¶ 8, ECF 41-2. Ms. Sommers reported that Mr. Geney Montes had stabbed

26  himself in the chest, climbed out the bedroom window, and run away with the knife. Sommers

27  Decl. ¶ 16; Stewart Decl. ¶ 8. The police found Mr. Geney Montes outside nearby, standing on top

28  of a 10-to-15-foot cement retaining wall. Stewart Decl. ¶ 9. The wall was situated on a hill on the

United States District Court
Northern District of California

1    west side of the Scott Boulevard overpass. *Id.* At the bottom of the hill was a dirt pathway. *Id.* The

2    path dead-ended at the Caltrain railroad track right-of-way. *Id.* Barbed wire prevented anyone

3    from entering the tracks. Dep. of Nick Nguyen ("Nguyen Dep.") 112:3-9, ECF 45. Dense,

4    overgrown shrubs and foliage also limited a person's ability to stray from the path. *Id.* 112:13-22.

5    In front of the pathway was a chain-link fence, with vertical wooden slats threaded into the fence.

6    Stewart Decl. ¶¶ 9, 11 The chain-link fence was between the police and Mr. Geney Montes. *Id.*

7    The chain-link fence transitioned into a concrete wall as it approached the CalTrain area. *Id.* ¶ 9.

8         Defendant Stewart was wearing a body-worn camera ("BodyCam"), and he turned it on as

9    he and the other officers found Mr. Geney Montes standing on the concrete retaining wall. Stewart

10   Decl. ¶ 10; Ex. A BodyCam recording, ECF 41-3. Mr. Geney Montes, standing on the wall, was

11   approximately 10 feet above the officers, and Defendant Stewart estimates that he was

12   approximately 25 feet away from Mr. Geney Montes. Stewart Decl. ¶ 11. Mr. Geney Montes was

13   shirtless and barefoot, wearing only yellow swim trunks with two front pockets. Dep. of Colin

14   Stewart ("Stewart Dep.") 155:10-23, 157:1-6, ECF 45; Stewart Decl. ¶ 11; Decl. of Joseph Cohen

15   ("Cohen Decl."), Ex. 2, Photo, ECF 44-3. His chest wound was bleeding significantly, with blood

16   staining his shorts. Stewart Dep. 157:7-10, 165:17-20. Mr. Geney Montes told officers that

17   someone in a red hat and white T-shirt had stabbed him, a statement officers did not believe. *Id.*

18   160:24-161:4. Defendant Stewart testified that he was not sure if the wound was caused by a stab

19   or a gunshot, though no one reported sounds of gunfire. *Id.* 157:23-158:2.

20        There were officers both in front of the footpath and looking down on the scene from the

21   Scott Boulevard overpass. Pilger Dep. 80:9-13. There were approximately six officers behind the

22   fence along the footpath. *Id.* 83:20-22. Multiple officers had their guns drawn and pointed at Mr.

23   Geney Montes. Dep. of Jake Malae ("Malae Dep.") 85:11-15, ECF 45. There was also a helicopter

24   overhead, and at least one officer found the noise "a little much" and worried that it would agitate

25   Mr. Geney Montes. *Id.* 85:18-24. At no point during the 10-minute standoff did Mr. Geney

26   Montes brandish a knife, gun, or any other weapon. Pilger Dep. 83:11-15.

27        For most of the standoff, Mr. Geney Montes stood with his right hand in his pocket,

28   ignoring the officers' commands to show them his hands. Stewart Decl. ¶ 12. Defendant Stewart

1    testified that he believed Mr. Geney Montes had a gun in his shorts pocket. *Id.* At times, Mr.

2    Geney Montes did remove his right hand from his pocket during the standoff. Malae Dep. 90:17-

3    18; Stewart Dep. 161:15-19. Defendant Stewart was able to see Mr. Geney Montes's entire body,

4    including the pockets of his shorts. Stewart Dep. 162:16-21. Defendant Stewart testified that he

5    was unable to determine if a gun was in Mr. Geney Montes's pocket. *Id.* 165:14-20, 166:6-14. Mr.

6    and Ms. Sommers have submitted evidence indicating the Mr. Geney Montes told officers he was

7    not going to shoot anybody. Decl. of Bryan Reuter ("Reuter Decl.") ¶ 4, ECF 44-2. Defendant

8    Stewart testified that Mr. Geney Montes threatened to shoot anyone who got close to him and

9    himself. Stewart Decl. ¶¶ 14, 17.

10        At the 9:35 mark of the BodyCam video, Mr. Geney Montes climbs down from the wall

11   and begins to walk north toward the Caltrain tracks. *See* BodyCam Recording; Stewart Decl. ¶¶

12   18-19. Mr. Geney Montes used both hands to climb down from the wall, and Defendant Stewart

13   could see both of his hands. Stewart Dep. 201:21-202:9. Defendant Stewart testified that Mr.

14   Geney Montes said he was going to shoot himself in the head and began counting, and Defendant

15   Stewart was concerned that Mr. Geney Montes would act when he reached a certain number.

16   Stewart Decl. ¶ 18. Another officer on the scene, Jordan Fachko, tried to subdue Mr. Geney

17   Montes with his taser, despite being on the opposite side of the fence, but the taser had no effect.

18   *Id.* ¶ 19. Mr. Geney Montes was running away from the officers. *See* BodyCam Recording. At this

19   point, Defendant Stewart began running after Mr. Geney Montes, running along the chain link

20   fence. Pilger Dep. 94:15-22; Stewart Decl. ¶ 19. When the chain-link fence turned into a concrete

21   wall about six feet high, Defendant Stewart jumped over the concrete wall, pursuing Mr. Geney

22   Montes. Pilger Dep. 95:25-96:4; Stewart Decl. ¶ 19.

23        Mr. Geney Montes was running toward the CalTrain tracks, which were beyond the

24   barbed-wire fence that marked the end of the dirt path. Stewart Decl. ¶ 19. Once he reached the

25   end of the path, Mr. Geney Montes turned right into an open gate into a fenced enclosure. Stewart

26   Dep. 229:8-10. The enclosure contained dense, heavily overgrown shrubs and foliage. Nguyen

27   Dep. 112:10-18. According to Officer Nick Nguyen, once Mr. Geney Montes went through the

28   gate into the enclosure, he stopped when he was about two or three feet inside because it was

impossible to go in any farther. *Id.* 115:5-8.

Defendant Stewart maintained his pursuit of Mr. Geney Montes and caught up with him after Mr. Geney Montes was through the gate and in the enclosure. Stewart Decl. ¶ 21. Defendant Stewart attempted to tase Mr. Geney Montes, but this had no effect. Stewart Dep. 229:12-13. Mr. and Ms. Sommers argue the video evidence establishes that one of the taser probes struck the chain-link fence between the two men. *See* BodyCam recording. The parties dispute what happened next. Defendant Stewart maintains that Mr. Geney Montes turned to face him and advanced suddenly and aggressively toward him. Stewart Decl. ¶ 21. At this point, Defendant Stewart fired four rounds of ammunition into Mr. Geney Montes, killing him. *Id.* Mr. and Ms. Sommers argue that the video evidence and autopsy establish that Mr. Geney Montes was not facing Defendant Stewart when he was shot—rather, he was standing perpendicular to Defendant Stewart. Cohen Decl. 4:22-5:20; *see also* BodyCam video. Mr. and Ms. Sommers have also presented evidence that none of the bullets entered Mr. Geney Montes in a front-to-back trajectory, as would be expected if Mr. Geney Montes was charging Defendant Stewart, and at least one bullet entered Mr. Geney Montes through his back. Cohen Decl. 3:21-5:16. Mr. Geney Montes died at the scene. *Id.* 5:17-20. No gun was found on him, and a bloody knife was recovered on top of a bush on the hill. Opp'n 13.

### F.    Procedural History

Mr. and Ms. Sommers filed their complaint against Defendants Stewart and the City on August 5, 2017. *See* Compl., ECF 1. Ms. Sommers, on her own behalf and as Mr. Geney Montes's heir and successor in interest, brings seven claims: 1) A violation of Mr. Geney Montes's Fourth Amendment rights under 42 U.S.C. § 1983 against both Defendants; 2) A violation of Mr. Geney Montes's Fourteenth Amendment rights under 42 U.S.C. § 1983 against Defendant Stewart; 3) A violation of Ms. Sommers's Fourteenth Amendment rights against both Defendants; 4) A violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 *et seq.*, against both Defendants; 5) a wrongful death/negligence claim under California state law against both Defendants; 6) assault and battery claims under California state law against both Defendants; and 7) negligent infliction of emotional distress ("NIED") under California state law brought by

Mr. and Ms. Sommers individually against both Defendants. *See* Compl. Defendants filed their answer on October 9, 2017. *See* Answer, ECF 16. On December 3, 2020, Defendants this motion for summary judgment, seeking dismissal of all claims. *See* Mot.

## II.    LEGAL STANDARD

### A.    Summary Judgment

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Celotex*, 477 U.S. at 325; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving

party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "[T]he 'mere existence of a scintilla of evidence in support of the [nonmovant's] position'" is insufficient to defeat a motion for summary judgment. *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *First Pac. Networks*, 891 F. Supp. at 514 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.   Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court has set forth a two-part approach for analyzing qualified immunity. The analysis contains both a constitutional inquiry and an immunity inquiry. *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003). The constitutional inquiry requires the court to determine this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If the Court determines that a constitutional violation could be made out based on the parties' submissions, the second step is to determine whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

The Supreme Court recently reiterated the longstanding principle that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District*

United States District Court
Northern District of California

1    *of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff v. Ricard*, 134 S. Ct. 2012,

2    2023 (2014)). "[A] defendant cannot be said to have violated a clearly established right unless the

3    right's contours were sufficiently definite that any reasonable official in the defendant's shoes

4    would have understood that he was violating it." *Plumhoff*, 134 S. Ct at 2023.

5          Importantly, though, "'it is not necessary that the alleged acts have been previously held

6    unconstitutional' in order to determine that a right was clearly established, 'as long as the

7    unlawfulness [of defendant's actions] was apparent in light of pre-existing law.'" *Bonivert v. City

8    *of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (quoting *San Jose Charter of Hells Angels*

9    *Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005)) (alterations in original).

10   There can be "the rare 'obvious case,' where the unlawfulness of the officer's conduct is

11   sufficiently clear even though existing precedent does not address similar circumstances." *Vazquez*

12   *v. City of Kern*, 949 F.3d 1153, 1164 (9th Cir. 2020) (quoting *Wesby*, 138 S. Ct. at 590). The

13   relevant inquiry is "whether the officer had fair notice that her conduct was unlawful." *Nicholson*

14   *v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct.

15   1148, 1152 (2018) (per curiam)).

16

17   **III.    DISCUSSION**

18       **A.    Request for Judicial Notice**

19          Defendants request the Court take judicial notice of a document from the 2017-2018 Civil

20   Grand Jury of Santa Clara County titled Police and the Mentally Ill: Improving Outcomes." *See*

21   Req. for Judicial Notice, ECF 41-6, Ex. C., Grand Jury Report, ECF 41-7. Mr. and Ms. Sommers

22   do not oppose this request.

23          A court may take judicial notice pursuant to Federal Rule of Evidence 201(b). Under Rule

24   201(b), a judicially noticed fact must be one that is "not subject to reasonable dispute because it:

25   (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

26   readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid.

27   201(b).; *see also M.S. v. County of Ventura*, No. CV 16-03084-BRO (RAOx), 2016 WL

28   11506613, at *6 (C.D. Cal. Oct. 24, 2016) (taking judicial notice of county grand jury report).

United States District Court
Northern District of California

Here, the Court GRANTS Defendants' request and will take judicial notice of the grand jury report.

### B.   Evidentiary Objections

Ms. Sommers has objected to Defendants introducing new evidence, in the form of four exhibits, with their reply brief. Obj., ECF 57. The exhibits are excerpts of deposition testimony from witnesses. *See* Reply, ECF 56. Defendants did not use any testimony from these witnesses to support the initial motion. "New evidence submitted as part of a reply is improper." *Morris v. Guetta*, No. LA CV12-00684 JAK, 2013 WL 440127, at *8 (C.D. Cal. Feb. 4, 2013). Accordingly, Ms. Sommers's objection to the four exhibits is SUSTAINED. The Court OVERRULES Ms. Sommers's objection regarding new arguments, as the Court does not read Defendants as advancing any novel arguments for the first time on reply.

### C.   Fourth Amendment Claim Against Both Defendants

The Court will first address the Fourth Amendment claim brought against Defendant Stewart and then turn to the claim against the City, which is brought pursuant to *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)).

#### i.   Fourth Amendment Claim Against Defendant Stewart
##### a.   Constitutional violation

Defendant Stewart argues that he is entitled to qualified immunity because his use of force was objectively reasonable and there was no clearly established law prohibiting his use of deadly force against Mr. Geney Montes. Mot. 14-18. Ms. Sommers argues that the force used by Defendant Stewart was unreasonable, and the Ninth Circuit has established that police officers are not entitled to qualified immunity in this situation. Opp'n 12-18. Ms. Sommers further argues that factual disputes between the parties prevents this Court from granting summary judgment. *Id.*

The Fourth Amendment "guarantees citizens the right to be secure in their persons...against unreasonable ...seizures of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (internal quotation marks omitted) (alteration in original). The "reasonableness" of a particular seizure depends on how it was carried out. *Id.* at 395. "[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1   'seizure' of a free citizen should be analyzed under the Fourth Amendment and its

2   'reasonableness' standard." *Id.* "The 'reasonableness' of a particular use of force must be judged

3   from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

4   hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). Because an inquiry into

5   excessive force "nearly always requires a jury to sift through disputed factual contentions, and to

6   draw inferences therefrom," the Ninth Circuit has held "on many occasions that summary

7   judgment or judgment as a matter of law in excessive force cases should be granted sparingly."

8   *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

9       The Court must assess the severity of the intrusion on Mr. Geney Montes's Fourth

10   Amendment rights by evaluating the type and amount of force inflicted, the government's interest

11   in the use of force, and then finally balance the gravity of the intrusion on the individual against

12   the government's need for that intrusion. *See Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116

13   (9th Cir. 2016), *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011). "We are mindful

14   that cases in which the victim of alleged excessive force has died 'pose a particularly difficult

15   problem' in assessing whether the police acted reasonably, because 'the witness most likely to

16   contradict [the officers'] story ... is unable to testify.'" *Gregory v. County of Maui*, 523 F.3d 1103,

17   1107 (9th Cir. 2008) (alternations in original) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.

18   1994)).

19       Here, there is no dispute that Defendant Stewart used deadly force that resulted in Mr.

20   Geney Montes's death. "The intrusiveness of a seizure by means of deadly force is unmatched."

21   *A.K.H. v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016) (quoting *Tennessee v. Garner*, 471 U.S. 1,

22   9 (1985)).

23       Regarding the second consideration, the government's interest in the use of force, the

24   Court considers three primary factors: "(1) 'whether the suspect poses an immediate threat to the

25   safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is

26   actively resisting arrest or attempting to evade arrest by flight.'" *Glenn*, 673 F.3d at 872 (quoting

27   *Graham*, 490 U.S. at 396). The most important factor is the threat to the safety of the officers or

28   others. *Smith v. City of Hemet*, 394 F.3d 698, 702 (9th Cir. 2005).

The parties dispute whether it was reasonable for Defendant Stewart to believe Mr. Geney Montes had a gun. Mot. 16; Opp'n 14. Defendant Stewart argues that he reasonably believed Mr. Geney Montes had a gun in his shorts pocket. Stewart Decl. ¶ 12. This belief came from a few sources. Another officer who responded to an earlier call told Defendant Stewart that Mr. Geney Montes threatened to shoot anyone who entered his room. *Id.* ¶ 5. Mr. Geney Montes allegedly told another officer he had "a bunch of rounds," a conversation that Defendant Stewart overheard. *Id.* ¶ 6. And Defendant Stewart observed Mr. Geney Montes during the standoff as he largely kept his hand in his pocket and threatened to shoot the officers if they got close to him. *Id.* ¶ 12.

Ms. Sommers argues that it was implausible for Defendant Stewart to believe Mr. Geney Montes may have shot himself in the chest, based on his ability to run away from the house and the officers along the chain-link fence. Opp'n 14. She further argues that it was implausible to believe Mr. Geney Montes was hiding a gun in his swim trunks, the only piece of clothing he was wearing at the time of his death. *Id.* At various points during the standoff, Mr. Geney Montes did show the officers both of his hands. Malae Dep. 90:17-18; Stewart Dep. 161:15-19, 201:21-202:9 And, Ms. Sommers argues, if Defendant Stewart was standing close enough to Mr. Geney Montes to see his facial expressions while Mr. Geney Montes was standing on the retaining wall (Stewart Dep 157:11-22), he was close enough to be able to deduce that Mr. Geney Montes could not be hiding a gun in his swim trunks. Opp'n 14. Ms. Sommers has submitted photographs made from the BodyCam footage captured by other officers on the scene that demonstrate, she asserts, that the swim trunks contoured to his legs, making it impossible to hide a weapon. Reuter Decl. Ex. C, Photographs, ECF 44-2. Both sides have also submitted the Defendant Stewart BodyCam footage itself. *See* BodyCam recording.

Ms. Sommers has submitted sufficient evidence on which a reasonable jury could find that a reasonable officer would not have concluded that Mr. Geney Montes had a gun in his swimsuit pocket. The Court has reviewed the full BodyCam video from Defendant Stewart. A jury will be able to consider the type of fabric and fit of the swimsuit, which is a common article of clothing, and determine whether Defendant Stewart's belief and conduct was objectively reasonable.

Mindful of the Ninth Circuit's direction to courts that "in the deadly force context, we

United States District Court
Northern District of California

United States District Court
Northern District of California

cannot simply accept what may be a self-serving account by the police officer," *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014), the Court finds disputed issues of fact that prevent granting summary judgment. "Because the person most likely to rebut the officers' version of events—the one killed—can't testify, '[t]he judge must carefully examine all the evidence in the record ... to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994). "This includes 'circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" *Cruz*, 765 F.3d at 1079. (quoting *Scott*, 39 F.3d at 915). The Court finds that a reasonable juror could believe the evidence and theory presented by Ms. Sommers and decide Defendant Stewart unreasonably believed Mr. Geney Montes had a gun.

Defendant Stewart cites *Smith* for the proposition that "[w]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith*, 394 F.3d at 704. Here, however, it is undisputed that Mr. Geney Montes never brandished a gun or a knife— indeed, he could not have done this since he was unarmed at the time of his fatal encounter with Defendant Stewart in the fenced enclosure. Mot. 13.

The Court finds the posture of this case analogous to *George v. Morris*. 736 F.3d 829 (9th Cir. 2013). In *George*, the Ninth Circuit stated that a "furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat" justifying the use of deadly force if an officer reasonably believes a person is armed. *Id.* at 838. The Ninth Circuit found the denial of summary judgment appropriate because it was disputed as to whether the decedent pointed his gun at the officers or took other actions that would have been objectively threatening. *Id.* There is a similar factual dispute regarding objectively threatening actions in this case.

In *Cruz*, the Ninth Circuit reversed a grant of summary judgment for police officers who shot and killed an unarmed man. 765 F.3d 1076. "To decide this case a jury would have to answer just one simple question: Did the police see Cruz reach for his waistband? If they did, they were entitled to shoot; if they didn't, they weren't." *Id.* at 1079. Four officers testified that he did reach for his waistband. *Id.* The Ninth Circuit reversed the summary judgment grant for defendants because a reasonable jury could have decided the decedent did not reach for his waistband.

> In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband? Cruz probably saw that he was surrounded by officers with guns drawn. In that circumstance, it would have been foolish—but not wholly implausible—for him to have tried to fast-draw his weapon in an attempt to shoot his way out. But for him to make such a gesture when no gun is there makes no sense whatsoever. A jury may doubt that Cruz did this. Of course, a jury could reach the opposite conclusion. It might believe that Cruz thought he had the gun there, or maybe he had a death wish, or perhaps his pants were falling down at the worst possible moment. But the jury could also reasonably conclude that the officers lied.

*Id.* 1079-1080. In the case before this Court, it is appropriate to allow the jurors to watch the BodyCam video and judge for themselves whether Defendant Stewart's beliefs and actions were objectively reasonable.

Because there remain factual disputes about Officer Stewart's decision to use deadly force, the Court cannot complete the balancing test required by *Graham* that weighs the gravity of the intrusion on the individual against the government's need for that intrusion. *Graham*, 490 U.S. at 396. Thus, the motion fails on this part of the qualified immunity analysis.

### b.  Clearly Established Law

Defendant Stewart also argues that there was no clearly established law prohibiting his use of deadly force in this scenario. Mot. 17-18. The Court finds that it is inappropriate to decide this part of the qualified immunity analysis at this stage of the case with a factual dispute regarding whether Defendant Stewart's use of force was justified. *See Glenn*, 673 F.3d at 870 ("We express no opinion as to the second part of the qualified immunity analysis and remand that issue to the district court for resolution after the material factual disputes have been determined by the jury."); *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming a denial of summary judgment on qualified immunity grounds because there were genuine issues of fact regarding whether the officers violated plaintiff's Fourth Amendment rights, which were also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions); *Santos*, 287 F.3d at 855 n.12 (finding it premature to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law

may depend on the jury's resolution of disputed facts and the inferences it draws therefrom").

The Court does note that *Cruz* clearly establishes that shooting an unarmed victim who did not make a furtive movement is unconstitutional. 765 F.3d 1076, 1079-80. *George*, another Ninth Circuit case where the decedent was acting erratically and had a gun but did not point it at the officers, clearly establishes that officers cannot shoot and kill a person without warning and without objective provocation. *See Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1018-19 (9th Cir. 2017) (summarizing *George*). Accordingly, Defendant Stewart's motion for summary judgment as to the Fourth Amendment claim is DENIED.

### ii.    Fourth Amendment Claim Against the City

The City seeks summary judgment on Ms. Sommers's *Monell* claim for liability. Mot. 18-19. Taking the facts in the light most favorable to Ms. Sommers, the Court finds that she has not presented evidence sufficient to support a *Monell* claim.

"A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation.'" *Dougherty*, 654 F.3d at 900 (alterations in original) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)). Municipalities can be liable for policies of inaction. *Tsao v. Desert Palace*, Inc., 698 F.3d 1128, 1143 (9th Cir. 2012) "A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Id.* (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir.1992)). "A plaintiff must show, in addition to a constitutional violation, that this policy amounts to deliberate indifference to the plaintiff's constitutional right and that the policy caused the violation, in the sense that the [municipality] could have prevented the violation with an appropriate policy." *Tsao*, 698 F.3d at 1143 (alteration in original) (internal quotations and

1  citations omitted).

2       Additionally, "Failure to train an employee who had caused a constitutional violation can

3  be the basis for section 1983 liability where the failure to train amounts to deliberate indifference

4  to the rights of the person with whom the employee comes into contact." *Long v. City of Los*

5  *Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388

6  (1989)).

7       The City argues that Ms. Sommers has no evidence establishing a policy, custom, or

8  practice or a lack of one that establishes deliberate indifference. Mot. 19. As to the Fourth

9  Amendment *Monell* claim for excessive force, this Court agrees. Ms. Sommers does not address a

10  *Monell* claim related to excessive force in her opposition brief, as she instead focuses on a *Monell*

11  claim under the Fourteenth Amendment for deliberate indifference related to the City's response

12  to Mr. Geney Montes's mental health needs and, in particular, the fourth call to the Sommers's

13  home. *See* Opp'n 18-21. In order to establish a triable issue of fact on a Fourth Amendment

14  *Monell* claim based on a municipality's pattern, practice, or custom, Ms. Sommers would need

15  evidence of a recurring failure to investigate and discipline municipal officers for constitutional

16  violations to help establish her claim. *See Hunter v. County of Sacramento*, 652 F.3d 1225, 1234-

17  35 (9th Cir. 2011), *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001). Ms. Sommers also

18  does not introduce any evidence related to use-of-force training and certainly none that suggests

19  "the need for more or different training is so obvious, and the inadequacy so likely to result in the

20  violation of constitutional rights, that the policymakers of the city can reasonably be said to have

21  been deliberately indifferent to the need." *Caldwell v. City of San Francisco*, No. 12-CV-01892-

22  DMR, 2020 WL 7643124, at *13 (N.D. Cal. Dec. 23, 2020) (citing *Rodriguez v. County of Los*

23  *Angeles*, 891 F.3d 776, 802 (9th Cir. 2018)). Accordingly, summary judgment is GRANTED for

24  the City on this claim.

25       **D.    Mr. Geney Montes's Fourteenth Amendment Claim Against Defendant Stewart**

26       At the January 7, 2020 hearing, counsel for Ms. Sommers conceded that this excessive

27  force claim on behalf of Mr. Geney Montes could not be properly brought as a substantive due

28  process claim and agreed to withdraw the claim. Accordingly, summary judgment is GRANTED

United States District Court
Northern District of California

17

1   on this claim.

2       **E.    Ms. Sommers's Fourteenth Amendment Claim Against Both Defendants**

3       Ms. Sommers's Fourteenth Amendment claim alleges that, by using excessive force in

4   shooting and killing Mr. Geney Montes, both Defendants deprived her of her substantive due

5   process interest in a familial relationship. Her *Monell* claim against the City also focuses on the

6   City's lack of a policy and failure to train officers to properly aid persons suffering from mental

7   health breakdowns. The Court will analyze each claim separately.

8           **i.    Familial Relations Claim Against Defendant Stewart**

9       Ms. Sommers's Fourteenth Amendment claim alleges that, by using excessive force in

10  shooting and killing Mr. Geney Montes, Defendant Stewart deprived her of her substantive due

11  process interest in a familial relationship. Here, too, disputed facts prevent the Court from granting

12  summary judgment.

13      The Fourteenth Amendment's substantive due process clause protects against "government

14  power arbitrarily and oppressively exercised." *County of Sacramento v. Lewis*, 523 U.S. 833, 846

15  (1998). "The Supreme Court has made it clear ... that only official conduct that 'shocks the

16  conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th

17  Cir. 2008) (quoting *Lewis*, 523 U.S. at 846). "The relevant question ... is whether the shocks the

18  conscience standard is met by showing ...deliberate indifference or requires a more demanding

19  showing [of] a purpose to harm [decedent] for reasons unrelated to legitimate law enforcement

20  objectives." *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) (quoting

21  *Porter*, 546 F.3d at 1137). Evidence of ulterior motive or bad intent is not required to satisfy the

22  purpose to harm standard. *S.R. Nehard v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019). "The

23  lower 'deliberate indifference' standard applies to circumstances where 'actual deliberation is

24  practical.'" *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (quoting

25  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir.2010)). In circumstances where an officer cannot

26  practically deliberate, such as when a snap judgment because of an escalating situation is

27  necessary, the purpose to harm standard applies. *Wilkinson*, 610 F.3d at 554. The parties dispute

28  whether Defendant Stewart had time to deliberate and which of the two standards is proper in this

United States District Court
Northern District of California

case.

"The Ninth Circuit has characterized opportunities to deliberate as existing along a spectrum." *Wroth v. City of Rohnert Park*, No. 17-CV-05339-JST, 2019 WL 1766163, at *8 (N.D. Cal. Apr. 22, 2019). At one end of the spectrum are high-speed automobile chases, which are always evaluated under the purpose-to-harm standard, regardless whether officers injure a fleeing suspect or an innocent bystander. *Id.* (quoting *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008) and *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999)). The purpose-to-harm standard also applies where a suspect seeks to use a vehicle as a weapon, as in *Wilkinson* and *Porter*. *Wroth*, 2019 WL 1766163, at *8. At the other end of the spectrum are cases involving persons in custody where "extended opportunities to do better are teamed with protracted failure even to care." *Porter*, 546 F.3d at 1139 (quoting *Lewis*, 523 U.S. at 853).

This case falls in between those two poles. The Court is mindful that the facts must be construed in the light most favorable to the plaintiffs at summary judgment. In this light, the BodyCam footage from Defendant Stewart is more than 10 minutes long. *See* BodyCam recording. It is only in the last 30 seconds, when Mr. Geney Montes is moving *away* from the officers, that Defendant Stewart decides to jump over the wall and chase him down a path that will leave him cornered and force the two into tight quarters. A police officer cannot create the escalation that then justifies the use deadly force. *See Porter*, 546 F.3d at 1141. Mr. Geney Montes was unarmed, and a reasonable jury could find that he did not make a furtive, threatening movement at Defendant Stewart. Further, a reasonable jury could determine that Defendant Stewart had nearly 10 minutes to deliberate before his fatal shots. "Here, there is evidence to support both standards, and the determination should be left to the jury." *Greer*, 229 F. Supp. at 1108 (citing *C.E.W. v. City of Hayward*, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015)). The factual dispute over the proper standard distinguishes this case from *S.R. Nehard*, cited by Defendants, in which the Ninth Circuit noted that the plaintiffs failed to raise the argument of whether the deliberate indifference standard should apply. 929 F.3d at 1139 n.13. Accordingly, Summary Judgment is DENIED.

### ii.     Fourteenth Amendment Claim against the City

United States District Court
Northern District of California

In addition to the Fourteenth Amendment claim against Defendant Stewart, Sommers also asserts *Monell* liability against the City. As an initial matter, the parties dispute the scope of Ms. Sommers's Fourteenth Amendment *Monell* claim. Opp'n 18-21, Reply 11-12. At the hearing, Ms. Sommers pointed to paragraph 20 of the complaint, which she alleges encompasses a *Monell* claim for: the officers' responses to the earlier 911 calls, when officers refused to enter Mr. Geney Montes's barricaded bedroom; the officers' refusal to render aid to Mr. Geney Montes at the end of the fourth 911 call after Ms. Sommers told them he stabbed himself; and the subsequent events that led to Mr. Geney Montes's death. Compl. ¶¶ 20, 39. The Court finds the complaint put Defendants on notice of a *Monell* claim stemming from this broader examination of the officers' conduct.

Ms. Sommers has advanced two different theories of *Monell* liability: a lack of a policy directing officers on how to aid individuals suffering from psychiatric or psychological problems and a failure to train them to do so properly. The City argues that Ms. Sommers does not have enough evidence to establish a *Monell* claim. Mot. 19-20. While a failure-to-train claim "typically requires a pattern of violations, *see Tsao*, 698 F.3d at 1145 there is no requirement that the challenged policy or practice of inaction result in a pattern of constitutional violations." *Matysik v. County of Santa Clara*, No. 16-CV-06223-LHK, 2018 WL 732724, at *14 (N.D. Cal. Feb. 6, 2018) (citing *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc) ("Notably, neither the Supreme Court in *Harris*, nor the Ninth Circuit, nor the Third Circuit, said that institutional liability was possible only if the record reflected numerous examples of the constitutional violation in question.")). The Court will examine each theory separately.

### a. Lack of Policy

To prevail on the lack of a policy theory, Ms. Sommers must demonstrate that Mr. Geney Montes suffered a constitutional violation, the City's policy, or lack thereof, amounts to deliberate indifference to his constitutional rights, and the policy caused the violation, in the sense that the City could have prevented the violation with an appropriate policy. *Tsao*, 698 F.3d at 1143. "Whether a local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question." *Estate of Joshua Claypole v. County of San*

1   *Mateo*, No. 14-CV-02730-BLF, 2016 WL 127450, at *12 (N.D. Cal. Jan. 12, 2016) (quoting

2   *Gibson v. County of Washoe*, 290 F.3d 1194-95 (9th Cir. 2002), *overruled on other grounds by*

3   *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc)).

4       The Court finds that Ms. Sommers has raised a triable issue of fact as to whether Plaintiffs

5   possessed a constitutional right of which they were deprived. In *Matysik v. County of Santa Clara*,

6   the court found a triable issue of fact on whether there had been a deprivation of constitutional

7   rights in the form of deliberate indifference to a severe safety need. No. 16-CV-06223-LHK, 2018

8   WL 732724, at *12 (N.D. Cal. Feb. 6, 2018). The decedent did not speak English and was

9   showing signs of dementia, but officials decided to release him onto the street without supervision,

10  without alerting his caretakers, or without providing him a means of transportation. *Id.* Similarly,

11  Ms. Sommers cites *Wood v. Ostrander* for the rule that an officer's "deliberate indifference to [a]

12  victim's well-being is more than negligence and supports [a] section 1983 claim." 879 F.2d 583,

13  588 (9th Cir. 1989). In *Wood*, a police officer arrested the driver of a car, impounded the car, and

14  left the passenger in a high-crime area at night, and the Ninth Circuit found that this was a genuine

15  issue of fact as to whether the officer showed deliberate indifference to the passenger's interest in

16  personal security under the Fourteenth Amendment. *Id.* Here, the City's officers ignored Ms.

17  Sommers's report that her son had stabbed himself and refused to check on him or call for medical

18  services when they were already at the residence. Pilger Dep. 71:4-9, 72:1-17. Officer Chris

19  Pilger, the person who spoke with Ms. Sommers, knew that Mr. Geney Montes had mental health

20  problems. Pilger Dep. 65:11-25. The Court finds that it is appropriate for a jury to decide if this

21  constitutes a deprivation of a constitutional right to a safety need.

22      Next, there is evidence from which a jury could conclude that the City's failure to adopt

23  more specific policies regarding police interaction with people suffering mental health crises

24  amounted to deliberate indifference. Ms. Sommers suggests a policy requiring officers to contact

25  the Mobile Crisis Response Team. DeFoe Decl. ¶ 20(b). Ms. Sommers presents testimony from

26  police chief Mike Sellers. *See* Dep. of Mike Sellers ("Sellers Dep."), ECF 45. Ms. Sommers

27  argues that Chief Sellers did not take action to address how his department handled encounters

28  with people in mental health crises despite 1) seeing an uptick in calls for mental health crises, and

United States District Court
Northern District of California

21

2) a 2014 incident in which a woman having a mental health crisis was shot and killed by the Santa Clara police. Opp'n 20. However, a fuller reading of Chief Sellers's testimony, as presented by Ms. Sommers, compels a different conclusion. Chief Sellers testified that he did make changes to department policy as he noticed the uptick in mental health calls to better equip his officers. Sellers Dep. 34:4-35:10, 52:12-22. And Defendants present evidence that Defendant Stewart underwent crisis intervention training and that the Santa Clara Police Department was one of only two local agencies in Santa Clara County to requires its full police force to undergo crisis intervention training. Stewart Decl. ¶ 22; Grand Jury Report Table A.

Ms. Sommers presents expert evidence in the form of an opinion from a police practices expert that the City's lack of a policy that required its officers to contact the Mobile Crisis Response Team or other professionals better trained to deal with mental health crises is a departure from the standards and practices of police departments in California. Decl. of Scott DeFoe ¶ 20b, ECF 44-4. This distinguishes Mr. Geney Montes's case from *Green v. Tri-County Metropolitan Transportation District of Oregon*, cited by Defendants, where the court found no failure to train claim in part because plaintiff "offers no evidence, by way of an expert opinion or otherwise, that the training program of the City or the School District is inadequate." 909 F. Supp. 2d 1211, 1221 (D. Or. 2012), *aff'd*, 583 F. App'x 832 (9th Cir. 2014). Here, the Court finds there is a genuine issue of material fact as to whether the City's failure to adopt more specific policies regarding police interaction with people suffering mental health crises amounted to deliberate indifference.

Finally, Ms. Sommers has raised a triable issue as to whether the lack of a specific policy regarding police interaction with people suffering mental health crises caused the violation of Mr. Geney Montes's right to safety. "If reasonable persons could differ over the question of foreseeability, summary judgment is inappropriate and the question should be left to the jury." *Matysik*, 2018 WL 732724 (quoting *Claypole*, 2016 WL 127450 at *10). The Court finds it appropriate to leave to the jury the necessary questions of proximate cause, intervening causes, and foreseeability. Accordingly, summary judgment on the *Monell* claim for liability stemming from lack of an appropriate policy in dealing with mental health crises is DENIED.

United States District Court
Northern District of California

### b. Failure to Train

While a failure-to-train theory typically requires evidence of a pattern of violations, "demonstrating a pattern of constitutional violations is not necessary where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Zuegel v. Mountain View Police Dep't*, No. 17-CV-03249-BLF, 2020 WL 5076628, at *11 (N.D. Cal. Aug. 27, 2020) (quoting *Long*, 442 F.3d at 1186). Taking the facts in the light most favorable to Ms. Sommers, the Court finds a triable issue of fact as to whether a violation of the right to safety of those interacting with the police while suffering mental health breakdowns is a highly predictable consequence of the City's alleged failure to equip law enforcement officers with specific tools to handle these recurring situations. Accordingly, summary judgment is DENIED.

### F. ADA Claim

Defendants seek summary judgment on Ms. Sommers's ADA Claim, which is asserted against both Defendants. Mot. 20-22. Defendants argue the claim fails for several reasons: Mr. Geney Montes did not have a qualifying disability, there is no evidence of a reasonable accommodation, and there is no evidence of intentional discrimination. *Id.*; Reply 14-15. The Court will first address the proper standard and apply it to the claim against the City and then evaluate the claim against Defendant Stewart.

### i. ADA Claim Against the City

To state a claim of disability discrimination under Title II of the ADA, including a reasonable accommodation claim, a plaintiff must allege that: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Bresaz v. County of Santa Clara*, 136 F. Supp. 3d 1125, 1132 (N.D. Cal. 2015) (citing *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).

The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(1). "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *Id*. § 12102(4)(A). Courts are to "interpret the 'substantially limits' requirement broadly, and accompanying regulations specify that '[s]ubstantially limits' is not meant to be a demanding standard." *Bresaz*, 136 F. Supp 3d at 1134. (quoting 29 C.F.R. § 1630.2(j)(1)(i)). Ms. Sommers has submitted evidence, in the form of her declaration, that Mr. Geney Montes had sought treatment for anxiety and suffered from paranoia, and these conditions prevented him from working. Sommers Decl. ¶ 4. He also suffered a mental breakdown that prevented him from flying and caused the Santa Clara police to put him on a 5150 hold in the month prior to this incident. *Id.* ¶ 6. Working qualifies as a major life activity under the ADA. 42 U.S.C. § 12102(2)(A). So is sleeping, *id.*, and Ms. Sommers testified that Mr. Geney Montes's mental health condition prevented him from sleeping for days at a time. Sommers Decl. ¶¶ 4, 6. The length of Mr. Geney Montes's mental health struggles—the last three years of his life, *id.* ¶¶ 4-7—distinguishes this case from *Bresaz*, which featured a man who suffered delusional beliefs on a single day. 136 F. Supp 3d at 1136. Viewing the facts in the light most favorable to Ms. Sommers, the Court finds that Plaintiffs have submitted evidence that Mr. Geney Montes was individual with a qualifying disability.

Defendants next challenge Ms. Sommers's suggestions of reasonable accommodations. Reply 15. In a Title II ADA case, the plaintiff bears the initial burden of producing evidence of the existence of a reasonable accommodation. *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014), *rev'd on other grounds City & County of San Francisco v. Sheehan*,

135 S. Ct. 1765 (2015).[1] Here, Ms. Sommers presents evidence in the form of deposition testimony from officer Mark Shimada, who stated that officers commonly refer family members and friends of those suffering mental breakdowns to Santa Clara Valley Medical, but that was not done in this case. Dep. of Mark Shimada 62:24-63:17, 78:6-9. The Court finds the evidence is sufficient, if credited by the jury, to establish the existence of a reasonable accommodation.

The Ninth Circuit's decision in *Sheehan* is illuminating here. 743 F.3d 1211. *Sheehan* involved "a near fatal tragedy in which police officers attempted to help a mentally ill woman who needed medical evaluation and treatment but wound up shooting and nearly killing her instead." *Id.* at 1215. Officers entered her room in a group home without a warrant, and she responded with violent outrage. *Id.* Sheehan alleged that city failed to provide a reasonable accommodation when the officers forced their way back into her room a second time without taking her mental illness into account. 743 F.3d at 1233. She asserted that the officers should have respected her comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation. *Id.* While acknowledging that the officers were forced to make split-second decisions, the Ninth Circuit nevertheless found summary judgment inappropriate for the defendants because the officers had an opportunity to wait for backup and to employ less confrontational tactics, including the accommodations that Sheehan asserts were necessary. *Id.* Additionally, the Ninth Circuit noted that the reasonableness of an accommodation is ordinarily a question of fact left for the jury. *Id.* Therefore, the Court finds that Ms. Sommers has offered sufficient evidence of a reasonable accommodation to survive summary judgment.

Finally, the City argues that there is no evidence of intentional discrimination, which is required for monetary damages under the ADA. Mot. 21; *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). Deliberate indifference is the appropriate test. *Id.* "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially

---

[1] The Supreme Court dismissed the question regarding *Sheehan*'s holding on the ADA claim as improvidently granted. *Sheehan*, 135 S. Ct. at 1774. Therefore, the Ninth Circuit's *Sheehan* opinion on the ADA claim is binding on this Court.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    likely and a failure to act upon that the likelihood." *Id.* (citing *City of Canton v. Harris*, 489 U.S.

2    378, 389 (1989)). Here, there is no question that Ms. Sommers informed the officers that Mr.

3    Geney Montes was suffering from mental health troubles, and the officers who responded to Ms.

4    Sommers's calls were aware of Mr. Geney Montes's mental health breakdown. Sommers Decl. ¶¶

5    9, 12; Malae Dep. 58:4-13. "When the plaintiff has alerted the public entity to his need for

6    accommodation (or where the need for accommodation is obvious, or required by statute or

7    regulation), the public entity is on notice that an accommodation is required, and the plaintiff has

8    satisfied the first element of the deliberate indifference test." *Duvall*, 260 F.3d at 1139. The Court

9    finds it factually disputed as to whether the City failed to act upon its knowledge that harm to Mr.

10   Geney Montes's constitutional right was substantially likely. Therefore, the Court finds that there

11   is evidence for a reasonable jury to conclude that the City intentionally discriminated against Mr.

12   Geney Montes. Summary judgment is DENIED as to the claim against the City.

13            **ii.    ADA Claim against Defendant Stewart**

14            As for the ADA claim against Defendant Stewart, Ms. Sommers states that a reasonable

15   accommodation on his part would have been to either use non-lethal force or let crisis intervention

16   trained officers take over communications with Mr. Geney Montes. Decl. of Scott DeFoe ¶ 14f.

17   However, Defendant Stewart, as an individual and not a public entity, cannot be sued under Title

18   II of the ADA. *See Minkley v. Eureka City Sch.*, No. 17-CV-3241-PJH, 2017 WL 4355049, at *6

19   (N.D. Cal. Sept. 29, 2017); *England v. Horel*, No. C 10-153 SI, 2010 WL 3910343, at *2 (N.D.

20   Cal. Oct. 4, 2010); *Stassart v. Lakeside Joint Sch. Dist.*, No. C 09-1131 JF(HRL), 2009 WL

21   3188244, at *11 (N.D. Cal. Sept. 29, 2009). Summary judgment is GRANTED on the ADA claim

22   against Defendant Stewart.

23            **G.    State Law Claims**

24            **i.    Assault and Battery, Wrongful Death/Negligence, and NIED Claims Related
                     to Use of Excessive Force**

25            Defendants argue that Ms. Sommers's state law claims fail if the Court finds that

26   Defendant Stewart's decision to use deadly force was reasonable. Mot. 22. Defendants also argue

27   they are immune from the battery and negligence claims under Cal. Gov't Code § 820.2.  Mot. 22.

28

1    This section provides that "[e]xcept as otherwise provided by statute, a public employee is not

2    liable for an injury resulting from his act or omission where the act or omission was the result of

3    the exercise of discretion vested in him, whether or not such discretion be abused."  Cal. Gov't

4    Code § 820.2.

5        In *Mendez v. County of Los Angeles*, the Ninth Circuit explained that "the California

6    Supreme Court has held that [§ 820.2] immunity applies only to policy decisions, not to

7    operational decisions like the [officers'] decision to enter the [plaintiff's] residence."  897 F.3d

8    1067, 1084 (9th Cir. 2018) (citing *Caldwell v. Montoya*, 10 Cal. 4th 972, 981 (Cal. 1995)).

9    "Moreover, this 'discretionary immunity' does not apply to excessive force claims." *Acosta v.*

10   *California Highway Patrol*, No. 18-CV-00958-BLF, 2019 WL 2579202, at *15 (N.D. Cal. June

11   24, 2019) (citing *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 267–68 (Cal. Ct. App. 1967) and

12   *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007)). Defendants' citation to

13   *Reyonlds v. County of San Diego*, 858 F. Supp 1064, 1074 (S.D. Cal. 1994) appears to be in

14   conflict with *Blankenhorn*, more recent, controlling Ninth Circuit law. And as the Court has

15   already established, there is a factual dispute as to whether Defendant Stewart's use of force was

16   reasonable. Accordingly, summary judgment is DENIED as to Ms. Sommers's assault and battery,

17   wrongful death/negligence, and intentional infliction of emotional distress claims, as they relate to

18   the use of excessive force.

### ii.   Negligence Related to Failure to Force Entry into Mr. Geney Montes's Bedroom

20   Defendants separately seek summary judgment on Ms. Sommers's negligence claim to the

21   extent it is related to the police officers' decision not to force entry into Mr. Geney Montes's

22   bedroom. Mot. 22. Defendants also claim immunity under California Government Code 856. Ms.

23   Sommers argues that the officers were negligent by failing to investigate her report that Mr. Geney

24   Montes had stabbed himself at the end of their trip to the residence on the fourth call and for

25   failing to involve mental health professionals in any of the calls. Opp'n 25.

26   California law states, in relevant part, "When a person, as a result of a mental health

27   disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer…may,

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  upon probable cause, take, or cause to be taken, the person into custody…" Cal. Welf. & Inst.

2  Code § 5150(a). California Government Code 856 immunizes public employees acting within the

3  scope of their employment from injuries resulting from determining, in accordance with any

4  applicable enactment: (1) Whether to confine a person for mental illness; (2) the terms and

5  conditions of such confinement; or (3) whether to release a confined person. Cal. Gov't Code §

6  856(a). The statute continues: "Nothing in this section exonerates a public employee from liability

7  for injury proximately caused by his negligent or wrongful act or omission in carrying out or

8  failing to carry out: A determination to confine or not to confine a person for mental illness or

9  addiction." Cal. Gov't Code § 856(c).

10  It is undisputed that Ms. Sommers told an officer responding to her fourth call that Mr.

11  Geney Montes had stabbed himself. Pilger Dep. 71:4-9. It is also undisputed that no officer went

12  back inside to check on Mr. Geney Montes before leaving. Sommers Decl. ¶ 15; Pilger Dep. 72:1-

13  17. Defendants, as the moving party, have not addressed Government Code § 856(c) and whether

14  this defeats their immunity claim.  They have not met the initial burden of demonstrating the

15  absence of a triable issue of material fact, and therefore summary judgment is DENIED on this

16  theory.

17      **iii. Mr. Sommers's Claim for NIED**

18  Finally, Defendants seek summary judgment on Mr. Sommers's claim for NIED on the

19  basis that he is not a proper plaintiff. Mot. 23. By Defendants' own admission, "[a]bsent

20  exceptional circumstances, recovery should be limited to relatives residing in the same household,

21  or parents, siblings, children, and grandparents of the victim." *Thing v. La Chusa*, 48 Cal. 3d 644,

22  688 n.10 (Cal. 1989). Here, it is undisputed that Mr. Sommers lived in the same house as Mr.

23  Geney Montes and was the only father figure he knew. Summary Judgment on this claim is

24  DENIED.

25

26  **IV. ORDER**

27  For the foregoing reasons, IT IS HEREBY ORDERED that:

28  1. Summary Judgment on the Fourth Amendment Excessive Force claim against

Defendant Stewart is DENIED;

      2. Summary Judgment on the Fourth Amendment Excessive Force claim against the City is GRANTED;

      3. Summary Judgment on Mr. Geney Montes's Fourteenth Amendment claim against Defendant Stewart is GRANTED;

      4. Summary Judgment on the Fourteenth Amendment Familial Association claim against Defendant Stewart is DENIED;

      5. Summary Judgment on the Fourteenth Amendment claim against the City is DENIED;

      6. Summary Judgment on the ADA claim against Defendant Stewart is GRANTED;

      7. Summary Judgment on the ADA claim against the City is DENIED;

      8. Summary Judgment on the assault and battery claim is DENIED;

      9. Summary Judgment on the wrongful death/negligence claim is DENIED; and

      10. Summary Judgment on the NIED claim is DENIED.

Dated: February 1, 2021

_____
BETH LABSON FREEMAN
United States District Judge